May it please the Court, Counsel, Kendra Matthews with Ransom Blackman on behalf of Petitioner George Williams. And this, Your Honor, did you need to call the case or is it... This is a matter of Mr. Williams as an inmate in the Bureau of Prisons and for the benefit of the courtroom. When a prisoner is serving time, he has the liberty interest in earning good time credits. In this case, Mr. Williams is brought a charge that the Bureau of Prisons denied him due process in three different instances when they took away his good time credits. In the first, he alleged that he wanted to call a witness, the warden of the prison that he had the incident occurred in, to advise the hearings officer that they had resolved it informally. In the second, we contend that he was punished twice for the same conduct. And in the third, it involves a case in which there was videotape evidence of what had occurred and witness statements of what had occurred, and the hearings officer, we contend, relied on unreliable witness statements, ignoring the conclusive evidence of the videotape. And it's that issue that we would like to address with the Court, barring questions first. This Court and the Supreme Court has said that a hearings officer in the Bureau of Prisons can be affirmed when there is some evidence in the record supporting the hearing officer's contention. But for due process to be met, that some evidence must have some indicia of reliability. There must be some basis to assume that that evidence is can be credited. And the court or the hearings officer cannot simply ignore countermanding evidence in reaching his conclusion. And here, relating to there were two officers who had injuries. One was Officer McDougall, and he indicated that he had been elbowed in the face by the defendant, and that that elbowing in the face by the defendant or the by the Petitioner was an assault. The videotape shows that Mr. Williams never threw any elbows. His arms were down against his body. This was a man who had put a noose around his neck. Officers come in. They're holding on to him. They're taking him down. And his uncooperative behavior was dead weight, passive resistance. Are we talking about the second attempted suicide with the mattress cover? The second attempted suicide, Your Honor. I've watched that video. And there's a lot of swarming around of people, and somebody's down on the floor, and then they're up, and then they're down. And I just can't see everything. I can't see anybody throw an elbow, but I don't know that I can see that an elbow wasn't thrown. And, Your Honor, you're correct that it is through watching the video that you have to make that determination. We've identified Officer McDougall, and we've tried to do that in the record, although it's quite tedious to do so. But at the time he says it happens, he says, we cut this noose, and he threw his elbow I don't know what else he was doing, but he threw his elbows. Although you can't see Officer McDougall, perhaps, through the entire thing, you can see Mr. Williams and what he's doing. And it's our contention that if you focus on his body and what he's doing, you can see he's not throwing elbows. Now, when you say I don't see everything the whole time, you do in that critical time frame see the entirety of Mr. Williams' body. That's my next question. Is your contention that this throwing of elbows had to have taken place during the initial time when they're taking him down? Yes. Because, and, Your Honor, I do contend that that is the case, because that is what Officer McDougall says happened. And perhaps he was hit. I mean, he has a scratch on his nose. He must have been hit by another officer, because he's just ---- Well, at some point in all of the ---- Well, because what happens is he comes down from the noose. He is dropped to the ground. And then you can identify Officer McDougall. At the end of the videotape, everyone goes around and they identify who they are. And so you can go back in time and identify Officer McDougall. At no other time is he anywhere near Mr. Williams. And so for that particular case, you can ---- there's another report, a Lieutenant Burns, who says that the elbowing happened in the hallway. And, in fact, that statement is non-controversial at all, although it is relied on by the officer. Because when you watch the videotape, you can see Mr. Williams, you can see Officer McDougall, and they're nowhere near each other. So that one should not have been relied upon at all. You're back to the point that the Court raised, which is making a determination as to whether or not identifying Mr. Williams' body the entire time in that initial portion is sufficient to undermine the DHO's ruling, and we contend it is. To Lieutenant Cape, it's a little bit of a different argument in that Lieutenant Cape says he was twisting, he was turning, he was headbutting when he dropped down, and he clearly wasn't doing that. He was passively resisting. And the district court said, I didn't see headbutting, I didn't see, you know, I didn't see what he testified to, but I did see that he was resisting and uncooperative. Well, resistance, as you can see, is being dead weight and just dropping down. And it's our contention that that is not assault. And so when you then turn to the reports and say, well, there were a whole slew of reports that were submitted, and all of those reports, except for the three that we've now gone over, all the other ones say he was assaultive and combative, or nothing at all. Those are just terms without descriptions. We can see what the action was on the videotape. And so it's our contention that for some evidence to have any meaning, for the Court to really have oversight that's meaningful in a factually contested incident, it must be that this doesn't meet the standard when you do have this type of video evidence. And if the Court doesn't have any questions about any further questions about that And that one, of course, we're not taking any factual objection to what the DHO officer said and found occurred. We have no basis to challenge that. But we are challenging the fact that he put forth credible support for the idea that he had resolved this informally with the warden. And the basis that the DHO gave for ignoring it, it's not relevant, ignores the functioning of the prison system and ignores that, yes, this incident may have been sent off to the FBI for consideration of criminal prosecution. That was a possible thing. That's separate than maintaining your prison. And here, if a warden says to you, hey, we'll take you off suicide watch. If you come off suicide watch, we'll get rid of these. That's something that's worth considering. And we think it's a violation of due process when your contention, the DHO's contention was, it's simply not relevant because it won't tell me whether you committed the conduct. Kagan. What's it mean to agree to come off suicide watch? Does that mean to agree to quick threatening to kill yourself? Mr. Williams, unlike the prior Petitioner, is not someone that the prison system has ever believed has a seer intent to injure himself. Right. I know. So my question is, what's that mean? Was it an agreement? Yes. That means it agrees to stop putting a noose around your neck, Your Honor. I apologize for cutting you off. That's okay. You answered my question. Okay. If there are no further questions, I'll reserve the balance for rebuttal. What about the warden, the lack of a warden's testimony? Your Honor, we contend that that was unfair. There could have been telephonic arrangements or other arrangements that would have been consistent with the prison interests to allow that warden to testify. We believe he should have been permitted to testify and be called as a witness by Mr. Williams to verify or counteract that he was at least in informal agreement. Thank you, Your Honor. All right. Counsel, that is my question. I don't understand why he wasn't allowed to call. Why is that irrelevant? Why is the warden's testimony irrelevant? My name is Natalie White on behalf of the warden. Sorry about that. Forgive me. So your question was about why it wasn't relevant. Why was it irrelevant? In that particular instance, the warden's testimony that was identified, that he was going to say that these potential sanctions were going to be expunged. Right. In actuality, the DHO's decision at that time was to determine whether or not the charged conduct had occurred. And the information that he was going to say was not relevant. Why was the conduct relevant if there was a deal to expunge the record if he agreed to come off suicide watch? Well, that deal is not quashed, necessarily.  That will not negate whether or not there was an actual agreement made, some sort of deal with the warden. But the DHO's decision at that time to review those charges and to make a determination of whether or not that conduct occurred, he has to consider whether or not that evidence and particular witnesses that are requested, whether or not those witnesses have something to offer as to whether or not he can decide those charged conduct occurred. Well, then, at what point would the prisoner be allowed to call the warden to establish whether there was a deal or not? Absolutely, Your Honor. There are several options, actually, that the inmate may have. The one important thing about this particular situation was the charged conduct was of a higher-level offense. And in that situation, although informal resolution in the institution is encouraged, a high-level offense has to be reviewed by the DHO. However, if there was a deal made, he would have the opportunity, either with his unit team -- every inmate has a unit team consisting of a counselor, a case manager, and a unit manager. They visit the inmate, even if he's in SHU, at least once daily, and they can bring it up with them. And that would be sort of an informal way to discuss the deal he had made with the warden. However, there's a much more formal system, the administrative remedy system, where he can actually make a request, an inmate request to staff, put it on paper saying this deal was made, and that way they can review it. If he does it after the DHO, it goes directly to the regional office for review. So the fact that he was at another institution with a new warden, it would not matter. Kagan. Kagan. Could he still do that now? It's my understanding that he may have actually used his remedies and may have been denied. That was not submitted. It's not part of the record. So if that deal had been made -- and it's not in the record, but it's our belief that that would probably be a pretty unlikely deal be made by a warden who had referred the matter for criminal prosecution. I do have another answer to one of your questions. You had asked what it means to come off suicide watch. Usually in an institution, when an inmate's on suicide watch, he's in a special part of the institution, a solitary cell. And in that solitary cell, there usually is required to have either a 24-hour watch by a BOP official or a 15-minute check, depending on the nature of that particular inmate's watch. So by you require manpower a lot of time to have someone on suicide watch. So it sort of makes sense as far as potentially the inmate wanted to talk about coming off suicide watch. So he would be removed from that cell and then put back into a normal cell in a normal housing unit. I do have some -- would like to address for a moment the video footage that Ms. She brought up several issues that she had brought up in her brief. First, I do contest her use of the word conclusive evidence when talking about the video. It was reviewed by both the DHO and the district court and yourselves. The government argues that that video was actually inconclusive. It certainly did show a lot of swarming. And there actually were times when you could not see the inmate or the inmate's arms. That was my interpretation of the video. And certainly, there's no merit to the argument that the DHO ignored the video at all. And as much as I'd like to stay focused on the video and her argument of timing, there's -- she's looking very nuanced at these reports by the officer who was injured in the nose. When he says he cut down the noose and afterwards the elbows were flying, we're talking a matter of seconds. It's probably less than a minute from the time that his -- the noose is cut, he's put down on the ground and the hand restraints are on the ground. She even refers to Officer Byrne's memorandum, which is on page 98 of the record. And in that memorandum, he does not suggest that the noose was hit of Officer McDougall in the hallway. He suggests that it was hit once the restraints were applied. And the restraints were applied, you can actually see in the video, inside the cell. The most important thing is that this is just one piece of evidence that was reviewed. The standard is some evidence, Your Honors. There were several, several memorandums from numerous officers. The video footage, although inconclusive as to the exact timing of the injuries, is consistent with all the other information that the officers report about what happened on that day. So to suggest that these injuries that occurred at the time of this inmate's reaction, that the officers had to come respond to him creating this situation, he certainly did cause that situation and cause the contact to occur that resulted in these injuries. If Your Honors do have any questions about the double-counting issue? So when does the government's position is that when he was trying to hang himself and he was cut down, that the elbow was thrown while he was falling? I believe that Officer McDougall was stating that following the timing of when the noose was cut, where immediately thereafter, Officer McDougall is involved in bringing the inmate down and controlling him and applying the restraints, that at that time, after the noose was cut, was when he was elbowed in the nose. Well, but he was surrounded by a lot of officers, wasn't he, that time? That is correct. He was surrounded by a lot of officers. So how would he get his elbow up? If you do watch the video, his hands do appear to be at the side, but there is a moment immediately after when the noose is cut where you cannot see the inmate or what his arms are doing at all. And when they're bringing the inmate to the ground, certainly it would not require much movement for an elbow to come back and hit someone in the face who's coming to your back to bring your hands together. Well, and he's hanging there. Do we know how long he was hanging? Seconds. If you remember from the video, he had actually been on suicide watch earlier that day and had just been moved to the special housing unit. So they were prepared. He had already been on watch. The staff were close by. And there was a staff actually right outside the door before he even put the noose around his neck. They were careful not to enter the cell too quickly. Sometimes that can be something an inmate may do, to try and lure an officer into the unit or into the cell. So immediately when he did put the noose around his neck, they entered the cell. It was very quick. And then they cut him down. Yes. And then there's a blank portion. And somewhere while the film was unclear or blank, the government's position is the elbow was thrown in? Yes, Your Honor. As far as Officer McDougall being very specific about the exact time in a matter of seconds as to when he was hit, the one thing that's clear is that the injury occurred during this conduct of them responding to the inmate. The staff certainly do not overstate their injuries. If anything, they're hesitant to even say that they were injured. This is something that occurred if it did not happen from the inmate. I'm sure the officers would state it occurred elsewhere. It wouldn't have mattered if somebody else had hit him in the nose. Would you say? It would not have mattered if it had been somebody else hitting him in the nose. But he had he stated that it was the inmate. It wouldn't matter if it was someone else's elbow? Absolutely. When a bunch of the officers are responding, there were several officers in there at the time, and he's creating that situation where people are getting abrasions, they're being hit. He's forcing the contact that's causing these injuries. He absolutely caused those injuries. Did he cause the injuries by trying to hang himself? Yes, he did, Your Honor. And his resistance and his assaultive and aggressive behavior afterwards. Opposing counsel discusses the her questioning of the use of the word aggressive or assaultive behavior. This is the highest security unit in the institution. When an inmate is resisting in a situation this dangerous, that is considered aggressive behavior in a special housing unit. Resisting, pulling. This inmate has been known to assault officers in the past. That's absolutely assaultive behavior in an institution. Counsel, I just have one more question before you leave the podium, and that is whether the hearing officer had the record in front of him that was made contemporaneously in the prison record indicating that the prisoner was to be transferred, his property was to be returned, and that all disciplinary actions were to be expunged. I know the district court judge had that, but did the hearing officer have that when he said that the warden's testimony was irrelevant? It's not. It's my understanding that he did not. I am over time, but if we have a moment, I wouldn't mind discussing that, those log entries. Do you know whether he had it? That's my question. Do you know whether he had it? From the record, it appears he did not have those at that time. Thank you. Would you like to discuss that anymore, those shoe log entries? There is some clarification that might be helpful that I could point to, especially because it's a little bit of BOP jargon. Is it in the record? It's the citations are in the record, but explaining what may be some of the code words might be really helpful as far as clarifying. You have to be really brief. I will be very brief, Your Honor. Okay. On those two, on the record at page 69, this is the first shoe log that you're referring to. This is a shoe log that was entered on August 27th, 2007. This is the one that says, following charges are suspended. This does not say expunged. When it lists these charges, they're talking about the suspension. What you noticed was just a few days earlier, this warden had referred this to the  When that happens the entry was referred to the FBI for review. Counsel, I was just talking about the September 3rd entry. Oh, sorry, Your Honor. That's okay. I can look at that one, too. So when the FBI is referred, then all charges are suspended. So that has nothing to do with expunged. The next one, though, where the inmates to be taken off, disciplinary segregation. That's what the D.S. stands for. And given all his property and pending sanctions and expunged. It's in the record, in a document, he had other pending sanctions from earlier incident reports over a set of time. I'm aware of that. Okay. I just wanted to make sure. If you have no further questions, thank you. All right. Thank you. Your Honor, very briefly, that procedure that counsel outlined for Mr. Williams securing the testimony of the warden, none of that was protected, presented to the district court, that alternative option for how one might go about getting verification and getting confirmation. In this proceeding that occurred, the DHO officer had two tasks, determine whether the conduct occurred and determine what the sanctions should be for it. And we contend that a warden's agreement would be relevant to determining what sort of sanctions should occur. And if the warden had agreed that there should be an expungement, we contend that would have been highly relevant, and there was no basis for the DHO to simply decide, we're not going to hear from you. We don't think it's relevant. Because he didn't say, I don't believe you. He just said, it doesn't matter. That's pretty well outlined in the brief. To briefly address the videotapes issue, I just wanted to clarify one thing, because I do think that's in the videotape, it's outlined in our briefs, conclusive or not is for the Court to determine. The gap in time that I believe you were referring to is when the videographer decides to come and look into the cell, and there's sort of a five-minute gap of time where the person holding the camera leaves the inmate and comes and does something different. And then someone says, what are you doing? Go follow the inmate. I do not believe that either side believes that there was an assault of conduct there. I do believe our dispute is in the minutes when he's being pulled down, put on the restraints in the cell and in that immediate hallway area. I believe that's what we're talking about. I see my time is up. Thank you, Your Honor. All right. Thank you. This matter is submitted.
judges: Goodwin, Pregerson, Christen